UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NADIRE ATAS , an individual, | |
| Plaintiff, | Case No.: |
| – against – | COMPLAINT |
| The New York Times Company, | JURY TRIAL DEMANDED |
| Dean Baquet , | |
| Ellen Pollock , | |
| Kashmir Hill  , | |
| JOHN DOES and/or JANE DOES 1-10, | |
| NEW YORK TIMES COMPANY  XYZ 1-10 , | |
| TREVOR TIMM , | |
| THE DAILY PODCAST, The Daily , | |
| MICHAEL BARBARO , | |
| Lawyers' Professional Indemnity Company (LAWPRO), | |
| Karen Granofsky, | |
| Matthew Cameron , | |
| JENNIFER HEFLER   , | |
| MATTHEW HEFLER , | |
| AKUMIN Inc , | |
| Riadh Zine, | |
| Dr. TODD ESSIG, | |
| MASON CAPLAN ROTI, | |
| GARY CAPLAN, | |
| ERIN CAPLAN , | |
| Josh Caplan, | |
| GUY BABCOCK, | |
| The Myers-Briggs Company, | |
| LUC GROLEAU, | |
| IBM, | |
| JULIA GROLEAU, | |

MARC GROLEAU,

SHU QUANG SHEN,

REBECCA HAUFE,

ANDREW HAUFE,

KATHERINE BRNJAC,

TOM BABCOCK,

RAMONA HELM,

JOHN BABCOCK,

MILA BAIER,

SHAWN MURRAY

AGNIESZKA MURRAY,

PRESTON SCHMIDT,

BRANDON SCHMIDT,

RALPH SCHMIDT;

SARA BASARA,

JOHN BAIER,

TONY LOCANE,

ALEXANDRA BORONDY,

ALFONSO COSENTINO,

STANCER GOSSIN ROSE LLP,

DR. JOSEPH CAPLAN,

Cardiac Solutions ,

DEREK LUTH,

YAHEL NOV,

JONATHAN MICHAEL STANCER,

CHARLES ADAM STANCER,

RAYMOND STANCER,

TOM PIRES,

NELLA PIRES,

DALE & LESSMANN LLP,

ROBERT E. DALE,

DAVID E. MENDE,

CHRISTINA J. WALLIS,

| | |
|---|---|
| KAGAN SHASTRI LLP, | |
| RAHUL SHASTRI, , | |
| DAVID WINER, | |
| STANCER GOSSIN ROSE LLP, | |
| RAYMOND STANCER, | |
| ERIC GOSSIN, | |
| MITCHELL ROSE, | |
| GARTH DINGWALL, | |
| RALPH STEINBERG, | |
| J. DAVID SLOAN, | |
| PEOPLES TRUST COMPANY, | |
| DEREK PEDDLESDEN, | |
| FRANK RENOU, | |
| MARTIN MALLICH, | |
| SHARON SMALL | |
| LILY MEIER | |
| ALANA STANCER | |
| SAMMY STANCER | |
| Defendant | |

Plaintiff Nadire Atas , as and for her  Complaint against Defendants respectfully allege as follows:

## INTRODUCTION

1. This defamation action arises out of the publication of  two (2) articles titled A Vast Web of Vengeance and Woman Accused of Defaming Dozens Online Is Arrested, The Times Podcast and the credited Reporter's personal social media accounts

2. The chart below provides a  summary of the false and Defamatory  Publications

| | New York Times |
|---|---|
| Jan 30 2021 | Electronic version NYT.com<br>A Vast Web of Vengeance |
| Jan 31 2021 | Print  version on front page<br>A Vast Web of Vengeance |
| Jan 31 2021 | Kashmir Hill<br>Linkedin<br><br>*I've written many stories about people being slandered online and not being able to fix it, but this one was at a scale and scope I've never encountered before. This woman attacks her perceived enemies, and then their family members and their colleagues and on and on. While I reported out the story, she came after me, my husband and my editor.* |
| Feb 10 2021 | Electronic version NYT.com<br><br>Woman Accused of Defaming Dozens Online Is Arrested |
| Jan 25 2022 | Electronic version NYT.com<br><br>*Update to* Woman Accused of Defaming Dozens Online Is Arrested<br><br>*Update Jan. 25, 2022: Prosecutors in Toronto withdrew criminal charges, including charges of harassment and libel, against Nadire Atas on Dec. 7, 2021.* |
| April 6, 2021 | A Vast Web of Vengeance The Daily Podcast Part 1<br><br>Hosted by Michael Barbaro<br>Guests: Kashmir Hill and Luc Groleau |
| May 3, 2021 | A Vast Web of Vengeance The Daily Podcast Part 2<br><br> Guests: Kashmir Hill and Luc Groleau |

**Vexatious Litigant Judgment of Justice David  Corbett made in the foreign jurisdiction of Ontario Canada.**

3.  The Plaintiff Nadire Atas is subject to a Judgment made under section 140 of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, as amended, dated January 3, 2018 . This was an application commenced and financed by Defendants Lawyers' Professional Indemnity Company (LAWPRO) and Peoples Trust Company.

4.  The vexatious litigant Judgment In clear , concise and unambiguous language,  creates a  Kangaroo Court .

5.  In  Paragraphs 2, 3, 4, 5, 6 , 7 and 35 of the Judgment, in clear , concise and unambiguous language,  Justice Corbett has placed himself as Judge, Jury, Executioner and Appellate Judge of his OWN ORDERS.

6.  Paragraphs 35 in clear , concise and unambiguous language orders  that if Justice Corbett ceases to be the case management judge,  then the case management judge shall be the person so appointed by the Toronto Regional Senior  Justice or his/her designate. If the position of case management judge is vacant, then the powers of the case management judge under this judgment shall be performed by the Toronto Regional Senior Justice or his/her designate and that Judge becomes Judge, Jury, Executioner and Appellate Judge of his/her OWN  ORDERS

7.  In  Paragraphs 2, 3, 4, 5, 6 , 7 and 35 of the Judgment, in clear , concise and unambiguous language, Atas must seek permission from Justice David Corbett to take any steps in any litigation in which she is involved, including proceedings launched against her

8.  Paragraph 8 of the Judgment orders  that Atas simultaneously provide a copy of the Judgment to any court outside of Ontario, Canada  when commencing or continuing an action and this includes actions launched against Atas . It is for this reason that this is included in this complaint filed in New York State.

9.  Paragraph 9 of the Judgment purports to have jurisdiction over criminal proceedings and criminal complaints to the Police and the Judiciary  . Unclear if this is limited to the Police and the Judiciary in Ontario , Canada.

10. Justice David Corbett has enforced his vexatious litigant  Judgment in all proceedings involving Nadire Atas including  proceedings launched against her where she is the defendant.

11. The four (4) defamation actions that resulted in a foreign judgment for defamation in which the New York Times story based its article  A Vast Web of Vengeance  was decided by the Courts in  the foreign jurisdiction in accordance with the vexatious litigant Judgment

12. In the chart below are Paragraphs 2, 3, 4, 5, 6 , 7 , 8 , 9 and 35 of the Vexatious Litigant Judgment of Justice D. L. Corbett made in the foreign jurisdiction of Ontario Canada and a true copy of the the Judgment is EXHIBIT 1

| Para. | Terms  of section 140 Judgment ( vexatious litigant |
|---|---|
| 1 | **THIS COURT DECLARE**S that the Respondents have persistently and without reasonable grounds instituted vexatious proceedings and conducted proceedings in a vexatious manner in the Courts of Ontario within the meaning of sections 140(1)(a) and (b) of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, as amended." |
| 2 | **THIS COURT ORDER**S that the Respondents are hereby prohibited, either directly or indirectly, from instituting any further action, application, proceeding, motion, assessment or appeal of any kind, save for an appeal from an Order granted in response to this application, on their own behalf or on the behalf of anyone else in any Court in Ontario until such time as they have obtained leave pursuant to section 140(3) of the *Courts of Justice Act,* R.S.O. 1990, c. C.43, as amended  and as provided for in this Judgment. |
| 3 | **THIS COURT ORD**ERS that the Respondents are hereby prohibited, either directly or indirectly, from continuing any action, application, proceeding, motion, assessment or appeal of any kind previously instituted in any Court in Ontario, on their own behalf or on the behalf of anyone else in any Court in Ontario until such time as they have obtained leave pursuant to section 140(3) of the *Courts of Justice Act,* R.S.O. 1990, c. C.43, as amended, and as provided for in this Judgment |
| 4 | **THIS COURT ORD**ERS that in the event that the Court makes an exemption to any Order requested herein permitting the Respondents to continue any action, application, proceeding, motion, assessment or appeal of any kind, any such action, application, proceeding, motion, assessment or appeal shall be subject to case management by the case management Judge |
| 5 | THIS COURT ORDERS that a copy of this Judgment and the Reasons for Decision be forthwith delivered to the Ontario Court of Appeal and to the Divisional Court " |

| | |
|---|---|
| 6 | **THIS COURT ORDER**S that the Respondents are prohibited from commencing any Application under section 140(3) of the *Courts of Justice Act*, R.S.O. 1990, c. C 43, as amended, for leave to proceed with a proceeding or step in a proceeding in any Court in Ontario until such time as they have obtained an order from the case management judge giving them permission to bring an application under section 140(3) of the *Courts of Justice Act*, R.S.O. 1990, c. C 43, as amended, for leave to proceed with a proceeding or step in a proceeding which order shall be obtained through a motion in writing and on a without notice basis. The steps for such a motion by the Respondents shall proceed as follows:<br><br>(a) The motion shall be accompanied by (a) an affidavit, not exceeding ten pages in length (double-spaced), that outlines the merits of the proposed proceeding or step; (b) explains the extent (if any) to which the Respondents have satisfied the outstanding costs awards against them; and (c) a copy of the Reasons for Judgment and this Judgment.<br><br>(b) If the court is of the view that the proposed application for leave to proceed has a sufficient degree of merit, the court will direct that a full application for leave to date for the hearing of that application shall be set thereafter." |
| 7 | **THIS COURT ORD**ERS that a copy of this Judgment, including the Reasons for Judgment, be sent to every Region of the Ontario Superior Court of Justice with a direction that no application by the Respondents under section 140(3) of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, as amended, for leave to proceed with a proceeding or step in a proceeding is to be filed or listed for hearing unless it is accompanied by an order as set out in the above paragraph." |
| 8 | **THIS COURT ORDER**S that neither of the Respondents shall commence or continue<br><br>(a) Court proceedings in the Federal Court of Canada or in any court outside Ontario, o (b) administrative proceedings of any kind (including, without limitation, complaints to any professional or regulatory body or claims to a human rights commission or tribunal) unless the Respondents simultaneously provide a copy of the Reasons for Judgment and this Judgment to the court, body, commission or tribunal to which the claim or complaint is made. |
| 9 | **THIS COURT ORD**ERS that the Respondents shall not seek to commence any criminal proceedings or make complaint to any peace officer without simultaneously (or, in exigent circumstances, as soon as is reasonably practicable) providing the judicial officer (whether a justice of the peace or other judicial officer) or the peace officer (as the case may be) with a copy of the Reasons for Judgment and this Judgment. |
| 35 | **THIS COURT ORDER**S that the "case management judge" for the purposes of this judgment is currently D L. Corbett J. If Justice Corbett ceases to be the case management judge, then the case management judge shall be the person so appointed by the Toronto Regional Senior Justice or his/her designate. If the position of case management judge is vacant, then the powers of the case management judge under this judgment shall be performed by the Toronto Regional Senior Justice or his/her designate |

## JURISDICTION AND VENUE

13. Ms Atas is an individual who resides in and is a citizen of the foreign state of Canada and is domiciled in Ontario , Canada

14. The Times is a New York corporation with its principal place of business at 620 Eighth Avenue, New York, New York

15. Dean Baquet, Ellen Pollock , Kashmir Hill , THE DAILY PODCAST are located in  New York, New York

16. This Court has personal jurisdiction over The Times pursuant to New York Civil Practice Law and Rules § 301 ("CPLR") because The Times has offices and its principal place of business in New York, New York, and the causes of action alleged herein arise out of The Times' activities in New York, New York. This Court also has personal jurisdiction over The Times under CPLR § 302(a) because this action arises out of The Times' transaction of business in New York, New York.

17. This action arose, and defamatory statements were published , within the Southern District of New York.

18. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

19. Venue properly lies within this judicial district pursuant to 28 U.S.C. § 1391 because The Times resides in this judicial district and a substantial portion of the events giving rise to the claims asserted in this action occurred in this judicial district


**Overview of the Parties**


20. The Plaintiff Nadire Atas is an individual , realtor and  private citizen of Canada and domiciled in Toronto Ontario Canada .

21. Defendant The New York Times Company is a publicly traded New York corporation with its principal place of business at The New York Times Building, 620 Eighth Avenue, New York, New York. It publishes The New York Times, which has the third largest circulation of any U.S.-based newspaper.

22. Defendant  Dean Baquet is the executive editor of The New York Times . He is a citizen of the State of New York and resides in New York City

23. Defendant Ellen Pollock is the business editor of The New York Times. She is a citizen of the State of New York and resides in New York City

24. Defendant Kashmir Hill  is a tech  reporter for The Times. Ms. Hill  was the credited author of " A Vast Web of Vengeance",  "Woman Accused of Defaming Dozens Online Is Arrested", and her own Linkedin and Twitter . She is a citizen of the State of New York and resides in New York City

25. Defendants JOHN DOES and/or JANE DOES 1-10, are unknown parties employed by The New York Times who acted as the reporters  for the defamatory stories at issue authored by Defendant Kashmir Hill . The identities of these individuals are presently unknown to Plaintiff.

26. Defendants NEW YORK TIMES COMPANY  XYZ 1-10 are unknown parties employed by The New York Times . The identities of these individuals are presently unknown to Plaintiff.

27. Defendant TREVOR TIMM is an individual domiciled in New York City and the husband of Defendant Kashmir Hill

28. Defendant THE DAILY PODCAST, The Daily is a daily news podcast and radio show by the American newspaper The New York Times. Hosted by Times political journalist Michael Barbaro, its episodes are based on the Times' reporting of the day with interviews of journalists from the New York Times.

29. Defendant  MICHAEL BARBARO Times is a political journalist for the Times and  is the host of the THE DAILY PODCAST

30. Defendant Lawyers' Professional Indemnity Company (LAWPRO) is a wholly Canadian owned insurance company that provides professional liability insurance to lawyers in Ontario.  LAWPRO is headquartered in Toronto, Ontario, Canada.

31. Defendant Karen Granofsky, Senior Claims Counsel  Lawyers' Professional Indemnity Company and domiciled in Ontario Canada

32. Defendant Matthew Cameron is a lawyer and member of the Law Society of Ontario and and domiciled in Arkansas USA

33. Defendant  JENNIFER HEFLER   is a lawyer and member of the Law Society of Ontario and domiciled in Arkansas USA

34. Defendant  MATTHEW HEFLER is an individual , brother of Jennifer Hefler and brother in law of Matthew Cameron and domiciled in Nova Scotia , Canada

35. Defendant AKUMIN Inc  Akumin Inc. is an outpatient diagnostic imaging services in the United States and headquartered in Florida USA and the employer of Matthew Cameron

36.  Defendant Riadh Zine, Chairman & Co-CEO, AKUMIN Inc  Akumin Inc

37. Defendants Dr TODD ESSIG, Training and Supervising Psychoanalyst with office in New York

38. Defendant MASON CAPLAN ROTI, is a law firm licensed to practice law in the province of Ontario Canada

39. Defendant GARY CAPLAN, is a lawyer and member of the Law Society of Ontario and domiciled in Ontario Canada

40. Defendant ERIN CAPLAN , is a lawyer and member of the Law Society of Ontario and domiciled in Ontario Canada

41. Defendant Josh Caplan, is an individual domiciled in Arizona USA

42. Defendant GUY BABCOCK, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in England UK

43. Defendant The Myers-Briggs Company, is one of the world's largest business psychology providers and is based in Sunnyvale, CA 94086, United States

44. Defendant LUC GROLEAU, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Quebec Canada

45.  Defendant  IBM, International Business Machines Corporation is an American multinational technology corporation headquartered in Armonk, New York, with operations in over 171 countries. It is the employer of Luc Groleau

46. Defendant JULIA GROLEAU, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Quebec Canada

47. Defendant MARC GROLEAU, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Quebec Canada

48. Defendant SHU QUANG SHEN, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in England UK

49. Defendant REBECCA HAUFE, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

50. Defendant ANDREW HAUFE, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

51. Defendant KATHERINE BRNJAC,individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

52. Defendant TOM BABCOCK, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in British Columbia, Canada

53. Defendant RAMONA HELM, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

54. Defendant JOHN BABCOCK, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

55. Defendant MILA BAIER, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

56. Defendant  SHAWN MURRAY individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

57. Defendant AGNIESZKA MURRAY, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

58. Defendant PRESTON SCHMIDT, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

59. Defendant BRANDON SCHMIDT, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

60. Defendant RALPH SCHMIDT; individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

61. Defendant  SARA BASARA, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

62. Defendant JOHN BAIER,individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

63. Defendant TONY LOCANE, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

64. Defendant ALEXANDRA BORONDY,individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

65. Defendant ALFONSO COSENTINO, individual and party to foreign judgment for defamation in court file no. CV-18-608448. He is domiciled in Ontario Canada

66. Defendant STANCER GOSSIN ROSE LLP, is a law firm licensed to practice law in the province of Ontario Canada

67. Defendant DR. JOSEPH CAPLAN, individual and party to foreign judgment for defamation in court file no. CV-18-594948 and domiciled in Arizona USA

68. Defendant Cardiac Solutions , Cardiac Solutions is a medical, physician-owned business located in Arizona USA owned by DR. JOSEPH CAPLAN

69. Defendant DEREK LUTH, individual and party to foreign judgment for defamation in court file no. CV-18-594948 and domiciled in Ontario , Canada

70. Defendant YAHEL NOV, individual and party to foreign judgment for defamation in court file no. CV-18-594948 and domiciled in Ontario , Canada

71. Defendant JONATHAN MICHAEL STANCER, individual and party to foreign judgment for defamation in court file no. CV-18-594948 and domiciled in Ontario , Canada

72. Defendant CHARLES ADAM STANCER, individual and party to foreign judgment for defamation in court file no. CV-18-594948 and domiciled in Ontario , Canada

73. Defendant RAYMOND STANCER, is a lawyer and member of the Law Society of Ontario and a party to foreign judgment for defamation in court file no. CV-18-594948 . He is domiciled in Ontario , Canada

74. Defendant TOM PIRES, Mortgage Broker and licensed with Financial Services Commission of Ontario. He is a   party to foreign judgment for defamation in court file no. CV-16-544153 and domiciled in Ontario , Canada

75. Defendant NELLA PIRES, Mortgage Broker and licensed with Financial Services Commission of Ontario. She is a   party to foreign judgment for defamation in court file no. CV-16-544153 and domiciled in Ontario , Canada

76. Defendant DALE & LESSMANN LLP, is a law firm licensed to practice law in the province of Ontario Canada nd a party to foreign judgment for defamation in court file no.CV-16-544153

77. Defendant ROBERT E. DALE, is a lawyer and member of the Law Society of Ontario and a party to foreign judgment for defamation in court file no.CV-16-544153 . He is domiciled in Ontario , Canada

78. Defendant DAVID E. MENDE, is a lawyer and member of the Law Society of Ontario and a party to foreign judgment for defamation in court file no.CV-16-544153 . He is domiciled in Ontario , Canada

79. Defendant CHRISTINA J. WALLIS, is a lawyer and member of the Law Society of Ontario  and a party to foreign judgment for defamation in court file no.CV-16-544153 . She is domiciled in Ontario , Canada

80. Defendant KAGAN SHASTRI LLP, is a law firm licensed to practice law in the province of Ontario Canada and a party to foreign judgment for defamation in court file no.CV-16-544153

81. Defendant RAHUL SHASTRI, is a lawyer and member of the Law Society of Ontario and a party to foreign judgment for defamation in court file no.CV-16-544153 . He is domiciled in Ontario , Canada

82. Defendant DAVID WINER, is a lawyer and member of the Law Society of Ontario  and a party to foreign judgment for defamation in court file no.CV-16-544153 . He is domiciled in Ontario , Canada

83. Defendant STANCER GOSSIN ROSE LLP, is a law firm licensed to practice law in the province of Ontario Canada and a party to foreign judgment for defamation in court file no.CV-16-544153 .

84. Defendant RAYMOND STANCER, is a lawyer and member of the Law Society of Ontario and a party to foreign judgment for defamation in court file no.CV-16-544153 . He is domiciled in Ontario , Canada

85. Defendant ERIC GOSSIN, is a lawyer and member of the Law Society of Ontario  and a party to foreign judgment for defamation in court file no.CV-16-544153 . He is domiciled in Ontario , Canada

86. Defendant MITCHELL ROSE, is a lawyer and member of the Law Society of Ontario and a party to foreign judgment for defamation in court file no.CV-16-544153 . He is domiciled in Ontario , Canada

87. Defendant GARTH DINGWALL, is a lawyer and member of the Law Society of Ontario and a party to foreign judgment for defamation in court file no.CV-16-544153 . He is domiciled in Ontario , Canada

88. Defendant RALPH STEINBERG,is a lawyer and member of the Law Society of Ontario and a party to foreign judgment for defamation in court file no.CV-16-544153 . He is domiciled in Ontario , Canada

89. Defendant J. DAVID SLOAN, is a lawyer and member of the Law Society of Ontario  and a party to foreign judgment for defamation in court file no.CV-16-544153 . He is domiciled in Ontario , Canada

90. Defendant  PEOPLES TRUST COMPANY, is a Canadian financial services company based in Vancouver, British Columbia and a party to foreign judgment for defamation in court file no.CV-16-544153

91. Defendant  DEREK PEDDLESDEN, is an individual and employee of Peoples Trust Company and party to foreign judgment for defamation in court file no.CV-16-544153

92. Defendant  FRANK RENOU, is an individual and employee of Peoples Trust Company and party to foreign judgment for defamation in court file no.CV-16-544153

93. Defendant  MARTIN MALLICH, is an individual and employee of Peoples Trust Company and party to foreign judgment for defamation in court file no.CV-16-544153

94. Defendant  SHARON SMALL is an individual and employee of Peoples Trust Company and party to foreign judgment for defamation in court file no.CV-16-544153

95. Defendant LILY MEIER is an individual domiciled in New York USA

96. Defendant ALANA STANCER is an individual domiciled in Ontario Canada

97. Defendant SAMMY STANCER is an individual domiciled in Ontario Canada

**THE FACTS**

| | **Statements in New York Times article A Vast Web of Vengeance** | |
|---|---|---|
| **1** | Mr. Babcock stared at the photo in shock. He hadn't seen it in decades, but he recognized it instantly. The woman's name was Nadire Atas; this was her official work portrait from 1990, when she worked in a Re/Max real estate office the Babcock family owned outside Toronto. She had initially been a star employee, but her performance deteriorated, and in 1993 Mr. Babcock's father had fired her. Afterward, she had threatened his father, according to an affidavit filed in a Canadian court. | This is false and defamatory<br>*From four (4) defamation motions before Justice David Corbett in Ontario Canada  for the* foreign Judgment for defamation dated January 28, 2021 (2021 ONSC 670). |
| **2** | Mr. Babcock felt lightheaded. A memory came back to him: When his mother died in 1999, the family had received vulgar, anonymous letters celebrating her death. A neighbor received a typed letter stating that Mr. Babcock's father "has been seen roaming the neighbourhood late at night and masturbating behind the bushes." The Babcocks had suspected Ms. Atas, who was the only person who had ever threatened them. (Ms. Atas denied making threats or writing the letters.)<br><br>Decades later, it appeared that she was still harboring her grudge — and had updated her methods for the digital age. | This is false and defamatory<br>*From four (4) defamation motions before Justice David Corbett in Ontario Canada  for the* foreign Judgment for defamation dated January 28, 2021 (2021 ONSC 670). |
| **3** | His brother-in-law, Mr. Groleau, contacted Ms. Wallis. She had represented a bank that foreclosed on two properties Ms. Atas owned in the early 2000s. Dozens of people had come under online attack: employees of the bank, lawyers who represented the bank, lawyers who represented those lawyers, relatives of those people and on and on. The attacks seemed engineered to perform well in search engines, and they included the victims' names, addresses, | This is false and defamatory<br>*From four (4) defamation motions before Justice David Corbett in Ontario Canada  for the* foreign Judgment for defamation dated January 28, 2021 (2021 ONSC 670). |

| | contact information and employers. (Ms. Atas denies being the author of many of these posts.)<br><br>For years, Ms. Wallis and her colleagues had been pursuing lawsuits and contacting the sites and technology platforms that hosted the material. Nothing had worked. The smears remained public, and the consequences became real. | |
|---|---|---|
| **4** | A relative of one lawyer said she spent months applying for jobs in 2019 without getting any offers. The woman, who asked not to be named because she feared Ms. Atas, said her bills piled up. She worried she might lose her home.<br><br>Then she decided to apply for jobs using her maiden name, under which she hadn't been attacked. She quickly lined up three interviews and two offers. | *Unnamed source*<br>*This is false and defamatory that Atas is the author* of the internet postings and that people fear Ms Atas |
| **5** | The victims in the Atas case live in Canada, Britain and the United States. In June 2020, Matthew Hefler, 32, the brother-in-law of a colleague of Ms. Wallis, became one of the latest targets. Mr. Hefler, who lives in Nova Scotia, is a historian who recently completed his Ph.D. in war studies. He is trying to find a teaching job. But anyone who searches for him online will encounter posts and images tarring him as a pedophile and "pervert freak."<br><br>Until recently, Mr. Hefler had never heard of Ms. Atas. He had no clue why she was attacking him. "You discover that someone you've never met, across the country, is running a one-man troll farm against you," Mr. Hefler said. "It's a nightmare scenario." | *Matthew Hefler is not a Plaintiff nor is he in any way affiliated with the defamation actions*<br>*This is false and defamatory that Atas is the author* of the internet postings about Matthew Hefler .<br>Justice David Corbett explicitly stated in his order dated August 5, 2021 that he makes no finding of authorship of internet postings published after November 2019 |
| **6** | In October 2018, Mr. Babcock and his family sued Ms. Atas for defamation in a Toronto court, detailing hundreds of posts falsely accusing them of pedophilia and other lurid acts. | This is false and defamatory<br>*From four (4) defamation motions before Justice David Corbett in Ontario Canada  for the*  foreign Judgment for defamation dated January 28, 2021 (2021 ONSC 670). |

|   |   |   |
|---|---|---|
| 7 | Ms. Atas claims that she didn't write those posts and that her enemies fabricated the case against her. <u>But the evidence suggests otherwise. For example, most of the attacks were posted anonymously, but like Mr. Babcock, I discovered a "paedophile" accusation against him on an old WordPress blog where she was listed as the author. When I asked her about it, Ms. Atas denied writing it. A few days later, the years-old comment had been deleted.</u> | This is false and defamatory |
| 8 | During multiple interviews in recent months, Ms. Atas refused to divulge much about herself. She told me she was worried about the impact of a New York Times article. "Anyone who Googles my name, this will come up, and I don't want this to come up," she said. | *Atas' concerns* about the impact of a New York Times article were real and legitimate |
| 9 | Ms. Atas, 60, grew up near Toronto. By the 90s, she had become a successful real estate agent. A colleague in the Babcocks' Re/Max office described her as "a producer" who thrived in what was then a male-dominated field.<br>In 1991, she had done well enough that she was able to buy a duplex. She later bought a building in Toronto, with four apartments that she rented out. | False and Defamatory.<br>*From four (4) defamation motions before Justice David Corbett in Ontario Canada  for the* foreign Judgment for defamation dated January 28, 2021 (2021 ONSC 670). |
| 10 | But her life was beginning to fall apart. In October 1992, her brother, then 23, called the police saying that their mother "was involved in a devil-worshipping cult," according to an article in a local newspaper, The Spectator. Days later, Ms. Atas's brother shot his mother in the hand. (A judge ruled that Ms. Atas's brother was not guilty by reason of insanity, The Spectator reported. I couldn't reach him for comment.)<br><br>"Obviously, it would take a toll on anyone," Ms. Atas told me.<br><br>A few months after the shooting, the Babcocks fired Ms. Atas. She told me she chose to leave on her own. | No purpose in writing this 30 year old story provided by Guy Babcock |

| 11 | Ms. Atas vanished from the public record for the next nine years. But around 2001, according to Ontario court filings, she was arrested and charged with assault and resisting arrest. The charges were ultimately withdrawn, but a peace bond, Canada's equivalent of a restraining order, was issued against her. | False and Defamatory |
|---|---|---|
| 12 | Ms. Atas moved into one of the apartments in her Toronto building, which was the subject of complaints from tenants. One, who moved in during 2008, found their new apartment filthy. When they opened the refrigerator, the tenant said in an interview, a "waterfall of maggots" poured out. | False and Defamatory<br><br>Unnamed<br><br>What interview and with whom? |
| 13 | Ms. Atas made the building's residents feel unsafe. "She has harassed us repeatedly, forcing us to finally call the police on her," according to an email from a tenant that was filed in court. Ms. Atas was charged with assaulting another tenant. She said in a court filing that at the time she "was suffering from severe mental illness that manifested itself in erratic behaviour that resulted in criminal charges." The charges were ultimately dropped. | This is false and defamatory<br>*From four (4) defamation motions before Justice David Corbett in Ontario Canada  for the*  foreign Judgment for defamation dated January 28, 2021 (2021 ONSC 670). |
| 14 | Ms. Atas stopped making mortgage payments on the building. In March 2008, her lender, Peoples Trust, represented by Ms. Wallis, began proceedings to repossess the property. She was evicted the next year. | This is false and defamatory<br>*From four (4) defamation motions before Justice David Corbett in Ontario Canada  for the*  foreign Judgment for defamation dated January 28, 2021 (2021 ONSC 670). |
| 15 | Ms. Atas allegedly resorted to revenge. In 2009, Matt Cameron, a junior lawyer working with Ms. Wallis on the Atas case, started getting calls and emails at the office from men interested in meeting for sex. Someone impersonating him had responded by email to raunchy Craigslist ads and given his contact information. (Metadata from those emails, filed in court, pointed to Ms. Atas's involvement.) | This is false and defamatory<br>*From four (4) defamation motions before Justice David Corbett in Ontario Canada  for the*  foreign Judgment for defamation dated January 28, 2021 (2021 ONSC 670). |

| 16 | A relative of Ms. Atas told me that family members had repeatedly tried and failed to get her help for mental health problems. "I have periodically suffered from depression," Ms. Atas wrote to me in an email. "I have had treatment. I am healthy and fine." | False and Defamatory. <br><br> Unnamed |
|---|---|---|
| 17 | 'I'm Frantic'<br>Many lawsuits sprang from the wreckage of Ms. Atas's homeownership. This is the only part of her life that she wanted to talk about with me: her legal cases, which are numerous. She sued the lawyers who opposed her, and she sued those who represented her, and she sued those who represented those lawyers.<br><br>And then, around 2015, she came across a new weapon. She started attacking her perceived enemies online on the Ripoff Report and elsewhere. She called Ms. Wallis and her colleagues "incompetent," "fraudsters" and "jackasses." (Ms. Atas acknowledged she was behind these posts.) Someone created multiple WordPress blogs to attack the lawyers.<br><br>Ms. Wallis had no doubt it was Ms. Atas. "She blames me clearly that I have cost her her livelihood and that I made everything in her life go wrong," Ms. Wallis said. "I would like her to be banned from the internet for life. She doesn't know how to use the internet without abusing everyone."<br><br>Ms. Wallis, other lawyers and Peoples Trust employees filed a defamation lawsuit against Ms. Atas in 2016. The judge told Ms. Atas to stop posting about the lawyers. So she began writing about their family members. That was also when the attacks on the Babcocks began. | This is false and defamatory<br>*From four (4) defamation motions before Justice David Corbett in Ontario Canada for the* foreign Judgment for defamation dated January 28, 2021 (2021 ONSC 670). |
| 18 | Gary M. Caplan, a lawyer in Toronto, represents dozens of people who have sued Ms. Atas for defamation. | This is false and defamatory<br>*From four (4) defamation motions before Justice David Corbett in Ontario Canada for the* foreign Judgment for defamation dated January 28, 2021 (2021 ONSC 670). |

| | | |
|---|---|---|
| | Gary M. Caplan is the lawyer for Ms. Wallis, Mr. Babcock and 43 others who have sued Ms. Atas for defamation. One of those plaintiffs is Mr. Caplan's brother, who came under attack after Mr. Caplan got involved in the case. There are another 100 or so people who have been targeted but aren't plaintiffs. Over the last two years, there have been more than 12,000 defamatory posts, according to software that Mr. Babcock's brother-in-law created to track new posts.<br><br>Many of the victims have tried to get tech companies to remove the abusive posts. Mr. Caplan said they have run headlong into American laws that protect American websites. | |
| 19 | There is Section 230 of the Communications Decency Act. It says that publishing platforms aren't liable for what their users publish, even if they moderate some content. (Section 230 has become a touchstone in politicians' fight against Big Tech. Conservatives argue it enables companies like Facebook and Twitter to censor them. Liberals argue it allows the companies to host harmful content with impunity.) And under U.S. law, a foreign court generally can't force an American website to remove content.<br><br>The only site the victims had success with was Ripoff Report. It took a year of emails from their lawyer, but in December 2016, the site took down 14 posts.<br><br>"Ripoff Report believes in the First Amendment but is also cognizant of the fact that people can, and do, abuse online platforms, including ours," said Anette Beebe, Ripoff Report's general counsel. "As resources allow, we certainly do try to address it if/when it comes to our attention."<br><br>The next month, Ms. Atas began calling Ed Magedson, Ripoff Report's founder, who routinely records his calls.<br><br>"I'm frantic right now. I had posted reports," Ms. Atas said in the first call. "I just discovered that your company has removed some of the postings." Ripoff Report provided the victims' lawyers with the recordings — proof that she was behind the abuse. | False and defamatory<br>This is from the foreign defamation Judgment |

| | | |
|---|---|---|
| | Aside from Ripoff Report, there were thousands of posts on more than 100 other "complaint sites." Most of those sites don't reveal who runs them and don't respond to emails. Those posts remain online. | |
| 20 | Trailing Ms. Atas<br>In Toronto, the court battle in the defamation cases continued. In 2017, Judge David Corbett deemed Ms. Atas a vexatious litigant who was "ungovernable and bent on a campaign of abuse and harassment," citing her digital assaults on lawyers. That meant Ms. Atas could no longer file lawsuits without the court's permission. At that point, her victims said, the attacks began increasing. | This is false and defamatory<br>*From four (4) defamation motions before Justice David Corbett in Ontario Canada  for the  foreign* Judgment for defamation dated January 28, 2021 (2021 ONSC 670). |
| 21 | **The next year, Mr. Caplan hired a private investigator to trail Ms. Atas, because she refused to say where she lived or how she accessed the internet.** Mr. Caplan wanted that information in order to obtain evidence for his lawsuit.<br><br>One evening in June 2018, the investigator followed Ms. Atas as she left court, got on a subway and then boarded a bus.<br><br>At 7:30 p.m., Ms. Atas entered a public library at the University of Toronto. She spent the next few hours at a computer, according to the **investigator's written report** and photos that he took surreptitiously. Then she rode a bus to a homeless shelter. (Ms. Atas denied that she stayed in the shelter.) | This is false and defamatory<br>*From four (4) defamation motions before Justice David Corbett in Ontario Canada  for the  foreign* Judgment for defamation dated January 28, 2021 (2021 ONSC 670). |
| 22 | In response to subpoenas, Pinterest, Facebook and WordPress, the blogging site, had provided Mr. Caplan with metadata about the abusive posts. Some had originated from computers at the University of Toronto. Suddenly, that made sense. | This is false and defamatory<br>*From four (4) defamation motions before Justice David Corbett in Ontario Canada  for the  foreign* Judgment for defamation dated January 28, 2021 (2021 ONSC 670). |
| 23 | Early last year, Judge Corbett found Ms. Atas in contempt of court because she had written to another judge, violating the restrictions placed on her as a vexatious litigant. She was sentenced to 74 days | This is false and defamatory<br>*From four (4) defamation motions before Justice David Corbett in Ontario Canada  for the*  foreign |

| | | |
|---|---|---|
| | in prison. While she was locked up, the online attacks slowed to a trickle. (The fact that they didn't cease altogether might have been because some complaint sites take content from one another, a pattern of mimicry that can keep attacks flowing.) When she was released in March, they resumed. Ms. Atas told me it wasn't her. | Judgment for defamation dated January 28, 2021 (2021 ONSC 670). |
| 24 | During an interview with Ms. Atas in November, she grew angry that I planned to write this article. A week later, someone started writing posts about me and my husband on Cheaterbot, BadGirlReports and some of the other sites where Mr. Babcock and others had been targeted. The posts claimed that my husband was a drug addict and that I was a plagiarist who slept with my boss in order to get promoted. Ms. Atas said it wasn't her.<br><br>Within a week, there were more than 100 posts about me.<br><br>After Ms. Atas talked to my editor, posts appeared about her. Ms. Atas said she hadn't created those, either.<br><br>In an email, she warned me, "Any story in the New<br><br> York Times will obviously bring out the trolls on the internet and could multiply the internet postings." | False and Defamatory |

98. Following the New York Times publication of A Vast Web of Vengeance , Atas was arrested by the Toronto Police and charged on behalf of eleven (11) persons under the Criminal Code of Canada with publication of defamation and false statements and Harassment

99. Upon Atas' arrest and while she was in custody, the parties in the four (4) defamation actions represented by Gary Caplan had brought an ex-parte motion to Justice David Corbett for an order to enter Atas home and seize her electronic equipment and papers .

100.    While Atas was in custody and while Gary Caplan scheduled  the ex-parte motion to be heard,  Gary Caplan and Matthew Cameron were simultaneously communicating with the Attorney General to oppose  Atas' release from custody pending  trial and for the Attorney General to require Atas to be ordered to undergo a psychiatric examination.

101.    Nadire Atas does not have a criminal record.

102.    In the chart below is the list of Complainants against Atas  to Criminal Charges in Toronto on February 9, 2021

| 1 | Matthew Hefler | 4 | Dr. Joseph Caplan | 7 | Guy Babcock | 10 | Jon Stancer |
|---|---|---|---|---|---|---|---|
| 2 | Matthew Cameron | 5 | Christina Wallis | 8 | Michael Borysenko | 11 | Luc Groleau |
| 3 | Gary Caplan | 6 | Natalie Wallis | 9 | Brad Bartja | | |

103.    In April 7, 2021, Atas was arrested again by the Toronto Police  and she was charged under the Criminal Code of Canada publication of defamation and false statements and Harassment, including against Lily Meier, who is the daughter of the editor of the New York Times, Ellen Pollock.

104.    Gary Caplan and Matthew Cameron were again involved in and pressuring the Attorney General to oppose Atas' release from custody pending  trial , even going as far to submit Justice David Corbett's orders made in the four (4) defamation actions  as evidence .

105.    In the chart below is the list of Complainants against Atas  to Criminal Charges in Toronto on April 7, 2021

| 1 | Lily Meier | 2 | John Babcock | 3 | Alana Stancer | 4 | Sammy Stancer |
|---|---|---|---|---|---|---|---|

106.    The Toronto Police had seized Atas' computer and cell phone on February 9, 2021 upon her arrest. Gary Caplan and Matthew Cameron provided the Toronto Police with the evidence filed for the foreign judgment for defamation on January 28, 2021 and the ongoing internet publications on the internet

107.    All the criminal charges against Atas were withdrawn by the Attorney General of Ontario on December 7, 2021

108.    The Times is a multi-billion-dollar global media organization that publishes The New York Times daily newspaper, one of the oldest and most widely circulated print papers in

the United States, and distributes content generated by its newsroom through its website www.NYTimes.com and several mobile platforms. The New York Times has been regarded as a national "newspaper of record," a moniker that reflects the considerable weight and influence attributed to the "voice" of The Times.

109.    The Times' print newspaper is sold in the United States and around the world through individual home delivery subscriptions, bulk subscriptions (primarily by schools and hotels), and single-copy sales.

110.    The Times' content reaches a broad audience through its print, web and mobile platforms, including over three million paid subscribers and approximately 140 million monthly unique visitors to its website. The Times charges consumers for content provided on its website and mobile applications. Digital subscriptions can be purchased individually or through group corporate or group education subscriptions. The Times' "Metered Model" offers Internet users free access to a set number of articles per month on its website, and then charges users for access to content beyond that limit.

111.    In recent years, The Times has been transitioning from its celebrated past as a great American print newspaper to a subscription-first, mobile-first news provider that is increasingly dependent upon click-based digital advertisements to generate revenue.

112.    As part of this transition, The Times and its Editorial section maintain their own social media accounts, such as Twitter and Facebook, on which they actively promote articles.

**Defamation Per Se and Defamation by Implication**


113.    Defendants  did so with the purpose and effect of having  others repeat and republish such false and defamatory statements and thereby further damaged Atas reputation.

114.    Defendants made their statements to discredit Atas in close consultation with New York Times, knowing full well they were false.

115.    Defendants  made their statements maliciously as part of an effort to falsely and maliciously discredit  Atas

116.    Defendants   intended their  false and defamatory statements set out above to be broadcast around the world and to injure and destroy Atas

117.    Defendants   intended their  false statements to be specific statements of fact, including a statement that Atas  was the author.

118.    Defendants'  false statements were broadcast around the world and were reasonably

understood by those who heard them to be specific factual claims that Atas was the author

119.    Using the powerful  respected reputation of the New York Times to falsely and maliciously discredit Atas by accusing her of intentionally and maliciously made false and damaging statements of fact concerning

120.    The false statements were published by the NYT

121.    Atas is not a public person and is not required to show malice.

122.    The New York Times published  false statements knowing full well that they were completely false. Accordingly, the  statements were made with actual and deliberate malice, the highest degree of awareness of falsity.

123.    False statements constitute libel.  The Defendants knew that they were going to be transmitted in writing, widely disseminated on the internet and in print. The Defendants intended their  false statements to be published by newspaper and other media outlets internationally, and they were, in fact, published globally, including within the Southern District of New York.

124.    False statements constitute libel per se inasmuch as they exposed Atas  to public contempt, ridicule, aversion, and disgrace, and induced an evil opinion of her in the minds of right-thinking persons.

125.    False statements were reasonably understood by many persons who read her statements as conveying that specific intention and meaning.

126.    The Defendants intended their  false statements to be widely published and disseminated  through newspapers, by podcast, by word of mouth and on the internet. As intended by Maxwell, her statements were published and disseminated around the world.

127.    The Defendants made her false statements both directly and through agents who, with her general and specific authorization, adopted, distributed, and published the false statements on his/her   behalf. In addition, he/she  and her authorized agents

128.    The Defendants made false statements in reckless disregard of their truth or falsity and with malicious intent to destroy Atas' reputation and credibility;

129.    The Defendants made their  false statements wantonly and with the specific intent to maliciously damage Atas'  good name and reputation in a way that would destroy her efforts to administer her , or share her life story, and thereby move forward with her life

130.    Defendants  false statements have caused, and continue to cause, Atas economic damage, psychological pain and suffering, mental anguish and emotional distress, and

other direct and consequential damages and losses.

131.    The Defendants' campaign to spread their false statements internationally was unusual and particularly egregious conduct.

**Intentional infliction of emotional distress**

132.    There was no legitimate reason or factual basis for the Atas article

133.    These defamatory statements about Ms. Atas  were circulated to millions of The Times' readers in print, on-line, and through mobile and social media.

134.    The online version of the Atas Article included several advertisements, which generated revenue for The Times

135.    The Times generates advertising revenue from banners, video, rich media and other interactive ads on its web and mobile platforms, such as those that accompanied the Atas  Article.

136.    Without conducting any reasonable investigation the Times jumped at the opportunity to falsely portray Atas  as the the author of tens of  thousand

137.     If the Times had engaged in basic journalistic due diligence regarding the veracity of the statements  it would have quickly discovered that it was false

138.    Likewise, if the Times had engaged in basic journalistic due diligence regarding the veracity of adversarial civil litigants  as a witness, it would have quickly discovered that they had an agenda

139.    The Times engaged in an agenda-driven campaign to bully, harass, threaten, disparage and vilify Atas

140.    As one of America's most prominent news outlets, the Times knew but ignored the importance of verifying damaging and, in this case, incendiary accusations against a private person prior to publication.

141.    By failing to correct its false reporting, the Times continued to promote its false narrative

142.    Given the breadth of the Times' media reach, its false and defamatory accusations against Atas were published repeatedly on various outlets. As a result, the Times' coverage generated its own media frenzy that subjected Atas  to public scorn, ridicule, and serious threats of physical harm and death threats

143.    The Times took advantage of the social media hate mob to further its own political and financial agenda.

**Invasion of Privacy – False Light and Intrusion Upon Seclusion**

144.    The Times ignored basic journalist standards because it wanted to advance its agenda

145.    The Times published or caused to be published false and defamatory statements in the Atas Article, which did and had the tendency to expose Atas  to hatred, contempt, ridicule and/or disgrace.

146.    The defamatory statements in the Atas Article are of and concerning Ms. Atas  and reasonably understood to be about Ms. Atas

147.    The defamatory statements in the Atas Article are false.

148.    The Times published the defamatory statements in the Atas  Article knowing that they are false or with reckless disregard for the truth of the statements.

149.    The defamatory statements in the Atas  Article have directly and proximately caused Ms. Atas to suffer significant damages, including damage to her reputation, humiliation, embarrassment, mental suffering, shame and emotional distress. These damages are ongoing in nature and will continue to be suffered in the future.

150.    The re-publication of the defamatory statements in the Atas  Article in other publications, as well as via the dissemination of the Atas  Article through social media, caused Ms. Atas  to suffer additional damages, all of which were foreseeable to The Times.

151.    The Times conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Ms. Atas , or in blatant disregard of the substantial likelihood of causing her harm, thereby entitling Ms. Atas  to an award of punitive damages.

152.    The Times did not issue a full and fair retraction and apology

**THE TIMES PUBLISHED NEGLIGENTLY AND MALICIOUSLY**

153.    The Times published Atas Article negligently and with actual knowledge of falsity or a reckless disregard for the truth.

154.    As one of the world's leading news outlets, the Times knew but ignored the importance of verifying damaging and, in this case, incendiary accusations prior to publication.

155.    The Times recklessly rushed to publish its Atas Article in order to advance its own political agenda and possibly other agendas to be discovered in the course of this litigation, and to create a false narrative

156.    The Times negligently published its Atas Article by failing to conduct a reasonable investigation prior to publication.

157.    The Times negligently published its Atas Article by relying on unreliable and biased sources with questionable credibility. The Times negligently published its Atas Article despite internal inconsistencies

158.    The Times' duty to investigate is heightened where, as here, the Atas involved criminal conduct

159.    The Times departed from the reasonable standard of care employed by journalists, including those standards articulated by the Society of Professional Journalists' Code of Ethics and its self-prescribed ethical Code by:

 (a) failing to verify each accusation before publication;

(b) failing to take special care not to misrepresent or oversimplify its coverage;

 (c) failing to use special sensitivity when dealing with children;

(d) failing to provide accurate context to its Atas Article;

(e) failing to avoid stereotyping;

(f) failing to examine the way in which its own biases and agenda shaped its false reporting;

(g) failing to treat Atas as a human being deserving of respect;

**The Times Published with Actual Malice**

160.    The Times recklessly published its Atas Article by failing to conduct a reasonable investigation prior to publication.

161.    The Times recklessly published its Atas Article by relying on unreliable and biased sources with questionable credibility

162.    The Times consciously elected to ignore this contrary information in favor of its pre-conceived false narrative against Atas

163.    To the date of filing this Complaint, the Times has stood behind the false and defamatory charge in its Atas Article, long after it had actual knowledge of its falsity,.

164.    The Times' actual malice is further evidenced by its failure to retract its Atas Article.

165.    The Times published its Atas Article with common law malice because:

(a) the Times intended to harm Atas

(b)the Times failed to retract its Atas Article despite the harm and danger it knew would be inflicted upon Atas; and

(c) the Times callously ignored the consequences of its actions upon Atas

166.    Further evidence that The Times acted with actual malice towards Atas is the fact that the Atas Article violates The Times' own policies and procedures, which forbid The Times' conduct here and label it intolerable. In its handbook entitled "Ethical Journalism: A Handbook of Values and Practices for the News and Editorial Departments"

167.    The journalistic standards spelled out in The Times 1999 "Guidelines on Our Integrity" are a supplement to its 2004 Handbook, and states that: "… it is imperative that The Times and its staff maintain the highest possible standards… [and that]… falsifying any part of a news report cannot be tolerated and will result automatically in disciplinary action up to and including termination."

**Conspiracy**

168.    The Times published or caused to be published false and defamatory statements which did and had the tendency to expose Ms. Atas to hatred, contempt, ridicule , death threats and/or disgrace.

169.    The defamatory statements in the Times article  are of and concerning Ms. Atas, and reasonably understood to be about Ms. Atas

170.    The defamatory statements in the Atas Article are false.

171.    The Times published the defamatory statements in the Atas  Article knowing that they are false or with reckless disregard for the truth of the statements.

172.    The defamatory statements in the Atas Article constitute defamation per se because they tended to injure Ms Atas  in her trade, business or profession

173.    The nature of the statements made about her, the extent to which those statements were circulated, and the tendency of such statements to injure someone such as Ms. Atas, the defamatory statements in the Atas  Article have directly and proximately caused Ms. Atas to suffer significant damages, including damage to her reputation, humiliation, embarrassment, mental suffering, shame and emotional distress. These damages are ongoing in nature and will continue to be suffered in the future.

174.    The re-publication of the defamatory statements in the Atas  Article in other publications, as well as via the dissemination of the Atas Article through social media, caused Ms. Atas to suffer additional damages, all of which were foreseeable to The Times.

175.    The Times conduct was committed knowingly, intentionally, willfully, wantonly and maliciously, with the intent to harm Ms. Atas, or in blatant disregard of the substantial likelihood of causing her harm, thereby entitling Ms. Atas to an award of punitive damages.

**The Times professes:**

176.    Reporters, editors, photographers and all members of the news staff of The New York Times share a common and essential interest in protecting the integrity of the newspaper. As the news, editorial and business leadership of the newspaper declared jointly in 1998: 'Our greatest strength is the authority and reputation of The Times. We must do nothing that would undermine or dilute it and everything possible to enhance it.'

The Times treats its readers as fairly and openly as possible. In print and online, we tell our readers the complete, unvarnished truth as best we can learn it. It is our policy to correct our errors, large and small, as soon as we become aware of them. … Staff members who plagiarize or who knowingly or recklessly provide false information for publication betray our fundamental pact with our readers. We will not tolerate such behavior.

(Emphasis added)


The Times' Standards and Ethics policy is posted online , and states in pertinent part:

 **Fairness**

The goal of The New York Times is to cover the news as impartially as possible – "without fear or favor," in the words of Adolph Ochs, our patriarch – and to treat readers, news sources, advertisers and others fairly and openly, and to be seen to be doing so. The reputation of The Times rests upon such perceptions, and so do the professional reputations of its staff members. Thus The Times and members of its news department and editorial page staff share an interest in avoiding conflicts of interest or an appearance of conflict.

**Integrity**

For more than a century, men and women of The Times have jealously guarded the paper's integrity. Whatever else we may contribute, our first duty is to make sure the integrity of The Times is not blemished during our stewardship. At a time of growing and even justified public suspicion about the impartiality, accuracy and integrity of some journalists and some journalism, it is imperative that The Times and its staff maintain the highest possible standards to insure that we do nothing that might erode readers' faith and confidence in our news columns. This means that the journalism we practice daily must be beyond reproach.

Because our voice is loud and far-reaching, The Times recognizes an ethical responsibility to correct all its factual errors, large and small. The paper regrets every error, but it applauds the integrity of a writer who volunteers a correction of his or her own published story. We observe the Newsroom Integrity Statement, promulgated in 1999, which deals with such rudimentary professional practices as the importance of checking facts, the exactness of quotations, the integrity of photographs and our distaste for anonymous sourcing.

**Truth**

As journalists we treat our readers, viewers, listeners and online users as fairly and openly as possible. Whatever the medium, we tell our audiences the complete, unvarnished truth as best we can learn it. We correct our errors explicitly as soon as we become aware of them. We do not want for someone to request a correction. We publish corrections in a prominent and consistent location or broadcast time slot. Staff members who plagiarize or who knowingly or recklessly provide false information for publication betray our fundamental pact with our readers. We do not tolerate such behavior.

The Times also publishes on its website the Society of Professional Journalists' Code of Ethics which states in pertinent part:

**Seek Truth and Report It**

 Journalists should be honest, fair and courageous in gathering, reporting and interpreting information.

**Journalists should:**

Test the accuracy of information from all sources and exercise care to avoid inadvertent error. Deliberate distortion is never permissible.

Diligently seek out subjects of news articles to give them the opportunity to respond to allegations of wrongdoing.

Distinguish between advocacy and news reporting. Analysis and commentary should be labeled and not misrepresent fact or context.

**Minimize Harm**

Ethical journalists treat sources, subjects and colleagues as human beings deserving of respect.

**Journalists should:**

Show compassion for those who may be affected adversely by news coverage.

**Be Accountable**

**Journalists should:**

Admit mistakes and correct them promptly

Expose unethical practices of journalists and the news media

Abide by the same high standards to which they hold others

177.    In publishing the Atas  Article A Vast Web of Vengeance - instead of removing the entire article or, at the very least, all references in it to Atas , and making a meaningful and sincere public apology – The Times violated and blatantly ignored the standards of ethical journalism which it has adopted and expects others to abide by

178.    The Times included a half-hearted and incorrect update to Woman Accused of Defaming Dozens Online Is Arrested with the following update:

Published Feb. 10, 2021 *Update Jan. 25, 2022: Prosecutors in Toronto withdrew criminal charges, including charges of harassment and libel, against Nadire Atas on Dec. 7, 2021.*

179.    This is particularly troubling given that, on November 13, 2016, The Times had pledged to rededicate itself to the "fundamental mission" of The Times journalism (the "Pledge"):

That is to report to America and the world honestly, without fear or favor, striving always to understand and reflect all political perspectives and life experiences in the stories that we bring to you. It is also to hold power to account, impartially and unflinchingly.

180.    In this instance, The Times is the power that must be held to account and, consistent with its Pledge, should accept full economic and journalistic responsibility to Atas  for the

falsehoods in the Atas  Articles  and the failure to retract it and issue a full and complete apology to Atas

181.    The Times knew that its defamatory statements about Atas  would be viewed by millions of people. The Times also knew that its defamatory Atas article  would be republished by numerous other news outlets and websites

182.    The Times actively promoted the Atas Article on social media, including on its Twitter feed, which has over 42 million followers

183.    Not surprisingly, the widely circulated and heavily promoted Atas  Article resulted in hatred and hostility toward Atas

184.    As set forth in the above-referenced ethical standards, which The Times adopted and expects of itself and others, "Ethical journalists treat… subjects… as human beings deserving of respect." The Times did not do that here.

185.    As a direct and proximate result of The Times' intentional and malicious misconduct, Atas   suffered anguish, humiliation, embarrassment and damage to her reputation – all of which are continuing in nature and will be suffered in the future.

186.    As a direct and proximate result of The Times' intentional and malicious misconduct, the Times also reaped ill-gotten gains from Internet advertising on the Atas  Article, which under the unique and special circumstances of this case, should be disgorged.

187.    The Times should not be permitted to profit from a false and defamatory column printed with malice and with the knowledge that the identity of the victim of the defamatory publication will "drive viewership and web clicks."

188.     All conditions precedent to the filing and maintenance of this action have been performed, have occurred or have been waived.


**DAMAGES**

189.    The publication of the False and Defamatory Accusations directly and proximately caused substantial and permanent damage to Atas

190.    The False and Defamatory Accusations were republished by third-parties and members of the mainstream and social media mob, which was reasonably foreseeable.

191.     The False and Defamatory Accusations against Atas are defamatory per se, as they are libelous on their face without resort to additional facts, and as clearly demonstrated here, Atas was subjected to public hatred, contempt, scorn, obloquy, and shame.

192.    As a direct and proximate result of the False and Defamatory Accusations, Atas suffered permanent harm to his reputation.

193.    As a direct and proximate result of the False and Defamatory Accusations Atas suffered severe emotional and mental distress.

194.    As a direct and proximate result of the False and Defamatory Accusations Atas is forced to live his life in a constant state of concern over his safety and the safety of his family.

195.    The New York Times published its False and Defamatory Accusations with actual malice and common law malice, thereby entitling Atas to an award of punitive damages.

196.    The Defendants' conduct was outrageous and willful, demonstrating that entire want of care that raises a conscious indifference to consequences.

197.    Atas is entitled to an award of punitive damages to punish CNN and to deter it from repeating such egregiously unlawful misconduct in the future

**CLAIM FOR RELIEF**

WHEREFORE, Ms Atas respectfully prays:

(a) That judgment be entered against New York Times for substantial compensatory damages in an amount not less than Two Hundred Million Dollars ($200,000,000.00);

(b) That judgment be entered against balance of Defendants for substantial compensatory damages in an amount not less than Two Hundred Million Dollars ($200,000,000.00);

(c) That judgment be entered against New York Times for punitive damages in an amount not less than Four Hundred Million Dollars ($400,000,000.00);

(d) That judgment be entered against the balance of the Defendants for punitive damages in an amount not less than Four Hundred Million Dollars ($400,000,000.00);

(e) That Atas recover her reasonable attorneys' fees and expenses from all the Defendants ;

 (f) That all costs of this action be taxed to New York Times ; and

(g) That the Court grant all such other and further relief that the Court deems just and proper, including equitable relief.

Respectfully submitted this 31st day of January , 2022.

Nadire Atas

2030 Kennedy Rd

Toronto Ontario M1T 3G2

416-274-5200